FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
10531 DUKE AVENUE SW,
ALBUQUERQUE, NM 87121

)
)
)
)
)
)

Case No.   **22mr1910**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of ____New Mexico____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 (a)(1) | Possession with intent to distribute controlled substances |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:
See attached affidavit submitted by SA Kevin Mondragon.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kevin Mondragon, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___Telephonically sworn and electronically signed___ *(specify reliable electronic means)*.

Date:   ___12/22/2022___

_____
*Judge's signature*

City and state:   Albuquerque, New Mexico

Kirtan Khalsa, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>**10531 DUKE AVENUE SW,**<br>**ALBUQUERQUE, NM 87121**<br><br>**5109 LOMAS DE ATRISCO ROAD NW,**<br>**ALBUQUERQUE, NM 87105;**<br><br>**AND**<br><br>**a 2010 CHEVROLET CAMARO, NM**<br>**PLATE 427-WRG, VIN#**<br>**2G1FB1EV9A9217528** | Case No. _____ |

### AFFIDAVIT IN SUPPORT OF APPLICATION
### FOR A WARRANT TO SEARCH AND SEIZE

I, Kevin M. Mondragon, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the premises known as 10531 Duke Avenue SW,

Albuquerque, NM 87121[1], 5109 Lomas De Atrisco Road NW, hereinafter "PREMISES 1" and

"PREMISES 2[2]," and a 2010 Chevrolet Camaro, NM Plate 427-WRG, VIN#

2G1FB1EV9A9217528 further described in Attachments A, for the things described in

Attachment B.

---

[1] Agents have identified 10531 Duke Avenue SW, a residence CORDOVA shares with his girlfriend. GPS tracking data in the past two months has placed CORDOVA at 10531 Duke Avenue SW, in the early morning hours and late evenings.

[2] Agents have recently learned from surveillance efforts, title company records, and law enforcement databases, that CORDOVA recently purchased 5109 Lomas De Atrisco Road NW, Albuquerque, NM for $149,811.60 on August 18, 2022 with a cashier's check. Current GPS tracking data from the past couple of months to 12-22-2022 have placed CORDOVA's 2010 Chevy Camaro at 5109 Lomas De Atrisco Road NW Albuquerque, NM.

2.      I have been a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") since October 2010.  I am currently assigned to the El Paso Field Division, Albuquerque District Office (ADO).  I have been a law enforcement officer for 23 years, serving as a sheriff's deputy, a police officer and a Special Agent.

3.      As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516.

4.      I graduated from the DEA Academy in Quantico, Virginia, where I received approximately 19 weeks of specialized narcotics-related training. The training covered controlled substance identification, narcotics related investigative techniques, interviews and interrogations, the preparation of search warrants, surveillance and electronic monitoring techniques, money laundering investigations and various forensic subjects, including latent fingerprint collection and analysis.

5.      As a certified Police Officer and DEA Special Agent, I have participated in numerous investigations of individuals and organizations trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine, fentanyl and other controlled substances. My experience as a Special Agent includes, but is not limited to: conducting surveillance; interviewing witnesses; participating in arrests, searches, and seizures; working in an undercover capacity and working with informants; writing wiretap affidavits; and investigating money laundering cases. I have received training and experience in the investigation of violations of federal and state drug and money laundering laws. I have participated in the investigation of several drug trafficking

conspiracies.  As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes and cryptic dialogues used by drug traffickers in both English and Spanish.

6.      I have been involved in an ongoing investigation into the distribution of controlled substances, specifically fentanyl and methamphetamine, by Marcos Cordova ("Cordova").  Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with the DEA, FBI, and law enforcement officials from other agencies, have obtained information regarding the illegal drug trafficking activities of Cordova, and others (the "SUBJECTS").

7.      I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as the knowledge of fellow agents and officers who have participated in the investigation.   In addition, I have developed information I believe to be reliable from other sources, including:

   a.      Information provided by Special Agents, and Intelligence Research Specialists of the DEA, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

   b.      Results of physical and electronic surveillance conducted by agents during the investigation;

   c.      A review of telephone toll records and subscriber information;

3

      d.      A review of driver's license and automobile registration records;

      e.      Records from commercial databases;

      f.      Records from the National Crime Information Center;

      g.      GPS ping data;

      h.      Other DEA agent's affidavits.

This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

8.     I believe there is probable cause that CORDOVA and his associates have committed, are committing, and will continue to commit offenses involving violations of, inter alia:

      a.      21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances; and

      b.      21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances.

## SUMMARY OF PROBABLE CAUSE

### Probable cause that CORDOVA is trafficking controlled substances

9.     This affidavit demonstrates chronological information related to CORDOVA's involvement in the drug trafficking trade with other subjects of DEA, FBI investigations and the Albuquerque Police Department Central Narcotics Unit.  In the past several months, DEA agents have arrested and interviewed several subjects who identified CORDOVA as their supplier.  This

information outlined below will show his further involvement with other drug traffickers, and their addresses in the Albuquerque area.  Agents have identified CORDOVA's primary residence as PREMISES 1. CORDOVA also recently purchased PREMISES 2. CORDOVA drives a 2010 Chevrolet Camaro, NM PLATE 427-WRG, VIN# 2G1FB1EV9A9217528.  Agents are requesting to search these residences and this vehicle for items of evidentiary value, related to drug trafficking activities. As discussed further below, I know from training and experience that drug traffickers frequently store controlled substances, trafficking paraphernalia, proceeds, records, and firearms at their homes. The other addresses mentioned below are addresses CORDOVA has visited during the course of this investigation, which I believe were related to drug trafficking activities. Furthermore, CORDOVA has no reported source of income, which leads me to believe that his main source of income is from illegal drug trafficking.

*June 13-23, 2022: CORDOVA identified as drug supplier to Albuquerque business*

10.     In June 2022, a confidential source[3] informed agents that a source of supply of a separate Albuquerque-based methamphetamine dealer was the driver of a neon green Camaro.

11.     On June 13, 2022, agents conducted surveillance at a business affiliated with drug trafficking activities in Albuquerque.  At approximately 2:38 p.m. a DEA agent observed a neon

---

[3] This confidential source was proven credible and reliable when used by the Sandoval County Sheriff's Office prior to August 17, 2022.  Prior to August 17, 2022, DEA agents with the assistance of the Sandoval County Sheriff's Detectives used the confidential source in three separate investigations, which resulted in the arrests of three subjects. However, on August 17, 2022, this confidential informant, hereinafter identified as (CW), was arrested in Arizona with a large amount of fentanyl pills and methamphetamine. On August 17, 2022, the CW was a documented confidential source with Sandoval County Sheriff's Office and the Albuquerque Police Department.  The CW agreed to a controlled delivery of the drugs seized to Onecimo MIRABAL on August 17, 2022.  According to Sandoval County Detectives, CW was not directed by Detectives to pick up and/or transport any drugs on behalf of law enforcement.  CW is currently in federal custody, facing drug charges.

green Camaro displaying New Mexico registration plate, 427-WRG, registered to CORDOVA parked at the business.

12.     On June 16, 2022, agents again observed the same neon green Camaro at the same business.

13.     On June 23, 2022, DEA agents observed the neon green Camaro arrive at the business and meet with the subject of that investigation in the parking lot.  Agents positively identified the driver of the green Camaro as CORDOVA.

14.     On June 23, 2022, DEA agents executed a federal search warrant at the same business in the Albuquerque area.  A search of that business revealed fentanyl pills, suspected cocaine, suspected heroin and suspected methamphetamine.  A post *Miranda* interview of the target of that investigation stated that CORDOVA was his/her drug source of supply.

*June 28, 2022: CORDOVA identified as drug supplier to R.G.*

15.     On June 28, 2022, DEA agents executed a federal search warrant at 2700 4th Street NW, room 19, Albuquerque, New Mexico, (the Court John Motel), the known residence of M.T. and arrested him on federal drug charges.  An undercover ("UC") DEA Task Force Officer ("TFO") was in telephone communication with M.T. in the days leading up to the search warrant, during which M.T. agreed to supply the UC with methamphetamine and fentanyl pills.  M.T. and the UC agreed to meet at room 19 on June 28, 2022, to complete the drug deal. During the investigation another individual, R.G., described the events leading up to the methamphetamine transaction and stated he had called his supplier (who was later identified as CORDOVA, the owner of a neon green Camaro), ordered the five pounds of methamphetamine, and retrieved the

methamphetamine from CORDOVA.   R.G.[4] stated that the name of the supplier of the methamphetamine is "Marcos" and is a major drug dealer, who drives a neon green Camaro.[5] Marcos is CORDOVA's first name and agents believe that R.G. was referring to CORDOVA. Agents located approximately 2,316.4 gross grams of methamphetamine (field-tested positive) outside the window of room 19 during the investigation.

*July-August 2022: CORDOVA's nexus to 1435 Atrisco Drive SW and YOUNG*

16.      In July 2022, agents interviewed a source of information (SOI-1)[6] in Albuquerque, New Mexico.  SOI-1 identified "Lobo" as a major source of supply in the Albuquerque area, working for the Sinaloa Cartel.  SOI-1 was able to identify "Lobo" from a photograph obtained through Facebook under Facebook account "Jesse Lobo." That photograph depicted Jessie YOUNG, positively identified by DEA agents through a photograph obtained by agents.

17.      On August 15, 2022, agents spoke to a source of information (SOI-2).  SOI-2 stated "Lobo" is a known large-scale fentanyl dealer in the Albuquerque area.  SOI-2[7] further stated that he/she has seen a large amount of U.S. currency in one of Lobo's vehicles, at 1435 Atrisco Drive

---

[4] R.G. was recently indicted on drug trafficking charges related to his involvement on June 28, 2022.

[5] CORDOVA has since been identified as a major supplier of methamphetamine and fentanyl related to another DEA investigation. During surveillance, agents observed a neon green Camaro arrive at a separate target location.
[6] SOI-1 is not a documented confidential source with DEA and has only provided intelligence information to investigators related to drugs traffickers in the Albuquerque area.  SOI-1's information thus far has been proven to be truthful and has been verified by agents.

[7] SOI-2 was a documented confidential source (CS) in the past with DEA and was found to be credible and reliable on several occasions; however, to date, SOI-2 is not currently a DEA CS.   SOI-2, while working for the DEA, was never found to be untruthful, and was paid a monetary gain during his/her services.

SW, Albuquerque, NM.  Agents provided a photograph of YOUNG to SOI-2.  SOI-2 positively identified YOUNG as "Lobo."

18.     On August 4, 2022, a United States Magistrate Judge approved a search warrant (22-mr-1157) for GPS ping data over cellular phone (505) 545-2598, a cellular phone under dominion and control of CORDOVA.  On August 12, 2022, agents received ping data from CORDOVA's cellular phone, placing him at 1435 Atrisco Drive SW (address associated with YOUNG).  At approximately 1:23 p.m. agents arrived at 1435 Atrisco Drive SW, and observed CORDOVA exiting the gate to the south of the property located on Kelly Road.  Agents observed CORDOVA as the passenger of a black Ford F-250, driven by another male subject.  Agents followed the Ford truck to a Chevron gas station.  Agents observed CORDOVA exit the passenger side of the truck and go inside the gas station as well as the male driver who stood outside the truck.  At approximately 1:50 p.m., agents followed the Ford truck with CORDOVA as the passenger and the male subject back to 1435 Atrisco Drive SW.  Agents observed the black truck enter the property through the south gate, located on Kelly Road.  Upon seeing the gate open, agents also observed a red Toyota Tacoma, which is a vehicle agents have observed CORDOVA operating, inside the property.

19.     On August 20, 2022, agents received and reviewed ping data from CORDOVA's cellular phone.  At approximately 6:08 p.m. GPS data placed CORDOVA's cellular phone at 1435 Atrisco Drive SW, Albuquerque, NM.  According to ping data, the cellular phone remained at 1435 Atrisco Drive SW until approximately 6:38 p.m.

20.     On September 1, 2022, DEA and FBI agents executed a federal search warrant at the 1435 Atrisco Drive SW, Albuquerque, NM.   A search of the residence resulted in the seizure of $1,809,517.82 and approximately one million fentanyl pills.  YOUNG was arrested and charged federally and remains in federal custody.

### August 11-17, 2022: CORDOVA's nexus to 1921 John Street SE and MIRABAL

21.     On August 11, 2022, in the morning hours, agents received GPS ping data over CORDOVA's cellular phone, which placed the cellular phone at 1921 John Street SE, Albuquerque, NM.

22.     At approximately 10:14 a.m. agents arrived at 1921 John Street SE, and observed CORDOVA's neon green 2010 Chevrolet Camaro, displaying New Mexico registration plate 427-WRG parked in the west side of the driveway.

23.     At approximately 10:19 a.m. agents observed an unidentified male wearing a white shirt, who agents believe was Onecimo MIRABAL (MIRABAL), and a second male, who agents believe was CORDOVA walking in the area of the driveway.  Agents observed CORDOVA getting into the driver's side of the neon green Camaro.  MIRABAL remained in the driveway and eventually walked back to the residence and entered the residence through a south door.  Agents obtained New Mexico registration RBL-028 plate off a silver sedan, which was parked in the south portion of the driveway. This plate came back registered to MIRABAL.  A few moments later, agents observed the neon green Camaro exit the driveway.

24.     Again, on August 17, 2022, agents conducted surveillance at 1921 John Street SE. At approximately 2:19 p.m. agents observed CORDOVA's neon green Camaro, displaying New

Mexico registration 427-WRG, parked in the driveway.  Agents observed CORDOVA walk away from the residence and to the green Camaro, get in the driver's seat, and depart the area.  Agents also observed a 2014 silver Cadillac displaying New Mexico registration plate of BHFG31, registered to MIRABAL, parked in the driveway.

25.     On August 17, 2022, a Navajo County Sheriff's Office (NCSO) deputy conducted a traffic stop on a white Mercedes on Interstate 40 (I-40) near milepost 289, in the State of Arizona. The deputy conducted the traffic stop for a license plate violation.  The Mercedes was driven by the "Cooperating Witness" (CW), accompanied by a passenger. The deputy came to suspect that criminal activity was afoot, and a drug detection dog ("K9") was deployed.   The K9 alerted to the presence of narcotics near the trunk of the white Mercedes.  The deputy conducted a search of the of the vehicle and located 2,051.4 grams (gross weight) of suspected fentanyl pills, 1,431.0 grams (gross weight) of suspected methamphetamine, firearm magazines, and ammunition.

26.     DEA agents in Albuquerque, New Mexico were contacted by Arizona law enforcement regarding the arrest of the CW.  CW agreed to conduct a controlled delivery to MIRABAL under DEA supervision.

27.     DEA agents took custody of the suspected fentanyl, suspected methamphetamine, and CW.  Agents transported CW and the white Mercedes to Albuquerque, New Mexico.  Agents advised the CW of his Miranda Warnings and agreed to speak to agents without an attorney present.  CW confessed to obtaining the illegal narcotics from Phoenix, Arizona, and attempting to transport them to Albuquerque, New Mexico.

28.     CW stated the fentanyl in the vehicle and one pound of methamphetamine were to be delivered to CHOPPER.  Chopper is a moniker used by MIRABAL.  At DEA agents' direction and under law enforcement surveillance, CW delivered "sham" fentanyl and methamphetamine to MIRABAL. MIRABAL was arrested shortly thereafter and had fentanyl on his person and in the trunk of his vehicle, along with baggies and a scale.  MIRABAL also had a handgun in his vehicle.

29.     On August 18, 2022, a United States Magistrate Judge approved search warrants for 1921 John Street SE, Albuquerque, New Mexico.[8]

30.     The search of 1921 John Street SE, revealed approximately 422.7 grams (gross weight) of fentanyl, 32.0 grams (gross weight) of methamphetamine, and several firearms.  The drugs were field tested by agents, which yielded positive results for fentanyl and methamphetamine.  In my training and experience, this amount of fentanyl is consistent with distribution amounts and not personal use.  Agents also located a money counter, U.S. currency and ammunition.

**Execution of federal search warrant at PREMISES 1 on September 1, 2022.**

31.     On September 1, 2022, DEA agents executed a federal search warrant at PREMISES 1.  A search of the residence revealed several plastic baggies containing brown substance resembling heroin.  The baggies were sent to the lab for testing, which tested positive for heroin.  Agents also located in a shed, and in a voided out punching bag, multiple plastic bags

---

[8]  A warrant was also issued authorizing the search of an apartment  associated with MIRABAL at  6350 Eubank Boulevard SW, Apartment 1326, Albuquerque, NM.  The search of that apartment revealed approximately 507.3 grams (gross weight) of suspected methamphetamine.  The methamphetamine was field tested, which yielded positive results for the presence of methamphetamine

with suspected residue. Agents believe these bags were used by CORDOVA to store illegal drugs. Agents sent those bags to the lab for testing, and received positive result for the presence of methamphetamine. Further, agents located in the residence a money counter.  In my training and experience, money counters are used by large-scale dealers to counts their drug proceeds.

**GPS tracking movements of CORDOVA's 2010 Chevy Camaro**

32.     Within the past 45 days, agents have been monitoring the movements of CORDOVA's 2010 Chevrolet Camaro, pursuant to a federal court order.   CORDOVA's movements have indicated that he visits residences in Albuquerque, NM affiliated with known drug dealers.  Agents believe CORDOVA supplied those drug dealers with illegal drugs.

**Execution of a state of New Mexico search warrant at 75 Hotel Circle NE, Room, 236, Albuquerque, New Mexico.**

33.     On December 22, 2022, DEA agents along with members of the Albuquerque Police Department Central Narcotics Unit executed a state search warrant at apartment 236. Agents entered the apartment and located the main subject of that investigation inside the apartment.  Agents searched the apartment and located over 3,000 fentanyl pills, approximately 58 grams of methamphetamine, three firearms, two of which were reported stolen, and a large amount of U.S. Currency.  The fentanyl and methamphetamine were field tested which tested positive for the presence of fentanyl and methamphetamine.

34.     The subject agreed to cooperate with agents.   The subject will be identified hereafter as, cooperating witness #2 (CW2).  CW2 identified CORDOVA as his/her supplier and identified his vehicle "the green car."  CW2 stated he/she has purchased methamphetamine and

fentanyl pills from CORDOVA within the past two months and sells the pounds of methamphetamine for $1,500 and $1.00 each fentanyl pill.  CW2 stated that the fentanyl pills and the methamphetamine located in the motel room  were what CW2 had purchased from CORDOVA the week before.  Note:  (On December 16, 2022, the GPS tracker placed CORDOVA at 75 Hotel Circle NE.  At approximately 2:00 p.m. agents located CORDOVA's 2010 Camaro parked on the north side of 75 Hotel Circle NE.  At approximately 2:25 p.m. agents observed CORDOVA walking from the west side of the building area and entered the 2010 Camaro. CORDOVA eventually departed this location.  I believe based on CW2's statement that CORDOVA had been at the apartment the week before, and the surveillance conducted on December 16, 2022, that CORDOVA is CW 2's supplier.

35.     On December 22, 2022, under the direction of agents, CW2 called CORDOVA at (505) 787-9657 with the hopes of ordering four "boats" (fentanyl pills) and four pounds of methamphetamine.   CORDOVA answered and CW2 asked to meet CORDOVA. CORDOVA asked what he/she was working on, meaning what CW2 needed. CW2 stated the same. CORDOVA agreed to meet he/she later in the day.  When he/she stated the "same," he/she stated that since he/she has purchased in the past four boats and four pounds of methamphetamine, CORDOVA understood that CW2 wanted four boats and four pounds of methamphetamine.

36.     Moments later, CORDOVA called the CW2 back and told him/her that he would call his source when he was done running errands and would call him/her to complete the drug deal.

37.     On this same date, and at approximately 10:53 a.m., DEA agents located CORDOVA at PREMISES 2.  He was the sole occupant and the driver of the 2010 Camaro.

38.     At approximately 11:14 a.m. agents observed CORDOVA enter the driver's seat of the 2010 Camaro and departed PREMISES 2.  Agent then followed him to a local business where CORDOVA remained.

39.     At approximately 1:20 p.m. agents observed CORDOVA re-enter the 2010 Chevrolet Camaro and departed the area.

40.     At approximately 1:35 p.m. the tracker placed CORDOVA at PREMISES 1.

41.     At approximately 1:56 p.m. CW2 placed a follow up call to CORDOVA. CORDOVA answered and he informed CW2 that he was on his way.

42.     At approximately 1:56 p.m. the GPS tracker showed the 2010 Camaro had departed PREMISES 1.

43.     At approximately 2:16 p.m. agents observed the 2010 Chevrolet Camaro arrive at 75 Hotel Circle NE. DEA agent moved and detained CORDOVA who was apprehended without incident. A brief search of the inside of the 2010 Chevrolet Camaro did not reveal any drugs. However, agents are aware of intelligence information from de-briefings of other co-conspirators, that CORDOVA's 2010 Chevrolet Camaro has a false compartment.  Knowing that information, agents drove the 2010 Chevrolet Camaro to the Albuquerque District Office where it remains until the approval of this search warrant.

44.     Rio Rancho Police Officer Brittany Ingram and her canine Chance conducted a sniff of the 2010 Chevrolet Camaro at 75 Hotel Circle NE.  Canine Chance alerted to the inside of

14

the 2010 Camaro. Both Officer Brittany and canine Chance are certified, through the National

Narcotics Detector Dog Association. Canine Chance is trained to detect methamphetamine, heroin,

cocaine, and MDA.

45.     Based on the calls with CW2 and the surveillance efforts right after the phone call,

and CORDOVA traveling to PREMISES 1, and shortly thereafter leaving PREMISES 1, agents

believe CORDOVA had picked up the four boats of fentanyl and the four pounds of

methamphetamine from PREMISES 1 and was traveling to meet CW2 to deliver the drugs.

*Evidence of CORDOVA's drug trafficking is likely to be found at PREMISES 1 and PREMISES 2*

46.     I further believe based on the statements made by R.G. and the other subject from

the June 23, 2022, investigation, the surveillance efforts conducted by DEA agents, the GPS data

obtained since August 8, 2022, the arrest of YOUNG and the GPS tracking data and the

cooperation of CW2 from December 22, 2022, and all the circumstances laid out in this affidavit

that CORDOVA is a significant fentanyl and methamphetamine supplier in the Albuquerque area.

47.     Based on my training, experience and participation in this and in similar

investigations, I believe that individuals involved in illegal trafficking of controlled substances

often conceal evidence of their drug trafficking activities in their residences and businesses, or the

residences of friends or relatives, and in surrounding areas to which they have ready access such

as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles

outside of their residences and businesses, so that they have ready access to it and so that they can

hide it from law enforcement, including law enforcement officers executing search warrants at

their residences or businesses.  Evidence also may be found in other areas to which a drug dealer

has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

48.    Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

49.    Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

50.    Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs,

16

miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

51.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

52.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or

relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

53.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

54.     Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

55.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and

safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

56.    Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

57.    The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include

phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

58.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.   They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

59.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

60.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

61.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.   This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

62.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital

surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

63.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

64.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

65.     A list of items agents seek authority to seize is in Attachment B.

*Electronic Media and Forensic Analysis*

66.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

67.     *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be

unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

68.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted

scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

69.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices

produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."   During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data base on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.      As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be

able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not

27

be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.   Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

This affidavit was reviewed by Assistant United States Attorney Nora Wilson.

## CONCLUSION

70.   I submit that this affidavit supports probable cause for a warrant to search PREMISES 1, PREMISES 2, and the 2010 Chevrolet Camaro described in Attachments A and seize the items described in Attachments B.

Respectfully submitted,

Kevin M. Mondragon
Special Agent
Drug Enforcement Administration


Electronically signed and telephonically sworn
on December 22, 2022:

United States Magistrate Judge, Kirtan Khalsa

29

## ATTACHMENT A

*Property to be searched*

The property to be searched is **10531 Duke Avenue SW, Albuquerque, NM 87121**, identified as "PREMISES 1," further described as the residential property located on Duke Avenue SW, Albuquerque, New Mexico, Bernalillo County.  PREMISES 1's stucco is brown with a brown roof.  The south facing garage door is tan.  Numbers "10531" are displayed on the east portion of the roof, near the garage.  There is a window with a white frame, facing south.  There is a security camera affixed above the garage door.  Both sides of the PREMISES are surrounded by cement brick walls. (See below photo for description of PREMISIS 1).

### PHOTO OF PREMISES 1



The search of the above PREMISES 1 shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trashcans) on PREMISES 1, and all persons located in PREMISES 1 in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in front of, PREMISES 1 that have an apparent connection to  PREMISES 1 and/or the SUBJECTS. Connection to the vehicles may be established by evidence that anyone residing at PREMISES 1 and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of PREMISES 1. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT B**

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841 –
distribution and possession with intent to distribute controlled substances; and 21 U.S.C. § 846 –
conspiracy to distribute and possess with intent to distribute controlled substances; those
violations involving Marcos Cordova, and others including:

1. Controlled substances, including, methamphetamine and fentanyl.

2. Drug paraphernalia, including scales, packaging materials, items for packaging and handling
   drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of
   value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the
   individual names of such persons, telephone numbers, addresses of these customers or dealers,
   and any corresponding records of accounts receivable, money paid or received, drugs supplied
   or received, or cash received to pay for controlled substances or intended to pay for controlled
   substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-
   conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-
   conspirators, or other communication devices used by them and/or their drug trafficking
   associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking
   associates.

3

8.  Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including utility bills, cancelled checks, or envelopes and deeds or leases.

9.  Indications of ownership or control over any vehicles located at the place to be searched, including titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.